DUBINA, Chief Judge:
I. BACKGROUND
A federal grand jury in the Southern District of Florida indicted Appellants Ad-ham Hassoun, Kifah Jayyousi, and Jose Padilla (referred to individually by name or collectively as “defendants”), along with Mohammed Youssef and Kassem Daher, for offenses relating to their support for Islamist violence overseas.[1] Count 1 charged defendants with conspiring in the United States to murder, kidnap, or maim persons overseas. 18 U.S.C. § 956(a)(1).[2] Count 2 charged defendants with conspiring, in violation of 18 U.S.C. § 871, to commit the substantive 18 U.S.C. § 2339A offense of “providing] material support or resources or concealing] or disguising] the nature, [or] source ... of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [§ 956(a)(1), i.e., a conspiracy to murder, kidnap or maim overseas].” 18 U.S.C. § 2339A. Count 3 charged defendants with a substantive § 2339A material support offense based upon an underlying § 956(a)(1) conspiracy. The charged conduct began in October of 1993 and continued until November 1, 2001. Before trial, this court reversed the district court’s order dismissing the most serious count, Count 1, for multiplicity. United States v. Hassoun, 476 F.3d 1181 (11th Cir.2007).
Trial commenced on April 16, 2007, and four months later, the jury returned a *1078 special verdict convicting defendants on all counts. The jury expressly found each of the three objects of the Count 1 conspiracy (the murder of persons outside the United States, the kidnapping of persons outside the United States, and the maiming of persons outside the United States) and found that Padilla’s and Hassoun’s offenses continued beyond October 26, 2001, but Jayyousi’s offense did not. The district court denied the defendants’ motions for judgment of acquittal and new trial. On Count 1, the district court sentenced Padilla to 208 months, Hassoun to 188 months, and Jayyousi to 152 months’ imprisonment. On Count 2, the district court sentenced each defendant to the maximum 60 months’ imprisonment. On Count 3, the district court sentenced Padilla and Hassoun to the maximum of 180 months’ imprisonment and sentenced Jayyousi to the maximum of 120 months’ imprisonment. The district court made all sentences run concurrently and imposed a 20-year period of supervised release for each defendant. The defendants appeal, and the government cross-appeals Padilla’s sentence.
II. ISSUES
1. Whether the district court properly admitted the testimony of FBI Agent John Kavanaugh.
2. Whether there is sufficient evidence to support Padilla’s convictions on all counts and Jayyousi’s conviction on Count 3, the substantive material support offense.
3. Whether the district court properly admitted the expert testimony of Dr. Rohan Gunaratna.
4. Whether the district court properly admitted against Hassoun and Jayyousi portions of a television interview with Osama bin Laden.
5. Whether the district court properly denied Padilla’s motion to suppress statements he made during an interview with FBI agents.
6. Whether the district court properly denied Padilla’s motion to dismiss his indictment based on alleged outrageous government conduct.
7. Whether the district court precluded Hassoun from admitting evidence of innocent intent.[3]
8. Whether the district court properly denied Hassoun’s motion for severance.
9. Whether the district court properly applied the terrorism enhancement to defendants’ sentences.
10. On cross-appeal, whether the district court erred procedurally or substantively in sentencing Padilla.
III. TRIAL EVIDENCE
The government’s theory at trial was that the defendants formed a support cell linked to radical Islamists worldwide and conspired to send money, recruits and equipment overseas to groups that the defendants knew used violence in their efforts to establish Islamic states. The government posited that the defendants’ efforts supported an international network of radical Islamists, including al-Qaeda and other terrorist groups such as Maktab al-Khidamat (“MAK”), the precursor to al-Qaeda founded by Palestinian Abdullah Azzam, and The Islamic Group of Egypt founded by an Egyptian cleric, Sheikh Omar Abdel Rahman (“the Blind Sheikh”). The government claimed that each defendant performed an important, but different, role in this support cell. To support its theory, the government pre *1079 sented evidence of intercepted telephone calls among defendants, faxes from, support groups to defendants, checks and receipts showing financial transactions by defendants, and an al-Qaeda “mujahideen identification form” that the government contended Padilla completed in July 2000, in order to attend a jihad training camp.
The defendants’ primary defense was their lack of'intent to support a violent form of jihad. They contended that they provided only humanitarian aid to oppressed Muslims and did not knowingly participate in a conspiracy to provide material support or resources for terrorist organizations that engaged in murder, kidnapping, or maiming in their efforts to establish Islamic states.
The government began its presentation of evidence with Jennifer Keenan, an FBI special agent, who was a legal attache in Yemen and Islamabad, Pakistan, in 2001. During this time, United States personnel obtained evidence such as photographs, letters, documents, passports, videotapes, and a blue binder, from Kandahar, Afghanistan. The FBI reviewed them for any imminent threat information. The FBI examined the binder for latent fingerprints, but did not translate any of the documents in the binder. [Doc. 1061, p. 9-54.] Tom Langston, a CIA officer, worked in Afghanistan collecting intelligence in support of military operations. He testified that an individual brought him the blue binder, telling Langston that he discovered it in an office that was formerly used by Arabs. This individual was affiliated with a tribal network that was cooperating with the United States against the Taliban. [Id. at 58, 67.]
Peter Carlson, Assistant Special Agent in charge of the Miami, Florida field office for the United States Department of State’s Diplomatic Security Service, testified that he issued visas and passports and assisted United States citizens who traveled abroad. [Id at 85.] He identified a certified copy of Padilla’s passport application that he received from Washington, D.C., copies of Padilla’s social security card and driver’s license, and a certified copy of a passport application that Padilla made in February 2001 in Karachi, Pakistan. [Id. at 101;- Gov’t Ex. 408, 408A, 408D, 409.] Carlson also identified a photocopy of the signature page and face page of Padilla’s allegedly lost 1996 passport. [Id; Gov’t Ex. 409A.] John Morgan, a fingerprint specialist, compared the prints from the blue binder with the FBI’s print card containing Padilla’s prints. [Doc. 1098, p. 22.] He identified Padilla’s prints on the front and back of a “mujahideen identification form,” which was in the blue binder. [Id at 35.] An FBI language analyst and interpreter, Nancy Khouri, translated the documents in the blue binder, 403TR-A through 403TR-E, from Arabic to English. She testified that the identification form had “Top Secret” on the bottom of it, and the applicant noted on the form that “Abu al-Fida” recommended him. [Id. at 148-49.] The applicant also noted that he had traveled to Egypt for study, Saudi Arabia for hajj (pilgrimage), and Yemen for jihad.. [M] The applicant answered some questions in Arabic, stated that his country was the United States, and gave his date of birth as 10/18/70, which was the same as the birth date on Padilla’s passport. . [Id at 144,148.]
The government then presented evidence from FBI language specialists and agents identifying numerous exhibits containing translated summaries of intercepted phone calls. One language specialist testified that he reviewed verbatim transcripts of the calls and made verbatim translations. [Doc. 1099, p. 61.] When he drafted the summaries, he listened to the calls while he read the translations to ensure a proper and accurate summary. [Id. at 80.] FBI Agent Kent Hukill testified *1080 that Hassoun was the subject of an intelligence investigation that Hukill, along with other agents, began in May 2002. [Doc. 1110, p. 77.] The agents reviewed the audio summaries and identified the other defendants as part of the investigation. [Id. at 90-91.] Agent Hukill interviewed Hassoun numerous times and identified his voice on the recordings. [Id. at 106.] He testified that the agents used verbatim transcripts of the pertinent call summaries, which numbered 700 out of 150,000 total calls. [Id. at 124.] He acknowledged that Padilla’s voice was identified in only seven of the calls. [7d at 162.]
Another government witness, Yahya Abrahim Goba, testified that he attended an al-Qaeda camp for the purpose of preparing for jihad, which he defined as military fighting. [Doc. 1383, p. 52.] When he obtained a visa from the Pakistani Consulate en route to training camp, Goba told the personnel that he was going to Afghanistan for “tourism.” [Id. at 61.] Goba stated that an individual who wanted to attend camp had to have a known and trusted al-Qaeda contact recommend him. [Id. at 59.] Goba explained that the camp participants stopped at “guest houses” in Pakistan that were managed by the Taliban and used for new recruits. Guards armed with AK-47 machine guns were at the guest houses. [Id. at 72.] When a participant arrived at the guest house, he relinquished his passport and other personal belongings to a trustee and filled out paperwork using an alias. [Id. at 79-82.] Goba stated that a recruit participated in basic training at the camps, which included war tactics, topography, and instruction with firearms and explosives such as hand grenades, land mines and Molotov cocktails. [Id. at 98.] Goba emphasized that no humanitarian work occurred at the guest houses, and the recruits all practiced military jihad at the camp. [Id. at 195, 202.]
Other FBI language specialists testified regarding the translations of the intercepted telephone calls. [Doc. 1111.] Fady Haydar stated that in numerous calls, individuals referred to Padilla as “Ibrahim,” “Abu Abdullah,” or the “Spanish Brother.” [Id. at 56.] Baria Dagher commented that Hassoun and Jayyousi were the primary participants in the intercepted calls he translated, and Joyce Kandalaft stated that she recognized the voices of Hassoun, Jayyousi, Kassem Daher, and Mohammad Youssef on the calls, and she noted that the individuals often used nicknames. [Id. at 160.] The government admitted the audiotapes through FBI Agent Russell Fincher, a counter-terrorism agent who listened to numerous audio tapes and read transcripts while listening to the tapes. Agent Fincher also interviewed Padilla at the Chicago O’Hare airport on May 8, 2002. [Doc. 1100, p. 44-94.] The district court admitted the tapes and transcripts over the defendants’ authentication and relevancy objections. [Id. at 154.]
The government also presented the testimony of two individuals who met some of the defendants at a mosque. Herbert At-well testified that he attended a mosque in South Florida where he met Hassoun and Padilla. [Doc. 1114, p. 6-48.] Atwell stated that Hassoun would invite people in the mosque to be mujahideen fighters, but that Hassoun was not recruiting people to be terrorist fighters. [Id. at 25.] Atwell understood that the mujahideen fight in wars for the cause of Islam. [Id. at 43.] Jeremy Collins testified that he met Jayyousi at a mosque in California, and after becoming friends with Jayyousi, learned that he was publishing a newsletter, “The Islam Report.” [Id. at 49.] Collins stated that Jayyousi was particularly concerned about the Blind Sheikh, who was convicted of conspiring to blow up the World Trade Center, and solicited funds for his defense. [Id. at 64.]
*1081 Collins also met Mohamed Zaky at the' California mosque and learned that Zaky was forming an organization called “Save Bosnia Now,” which he later renamed “American Worldwide Relief’ (“AWR”), and this group worked with the American Islamic Group. Collins performed several duties for AWR — he paid bills, deposited checks, purchased medicine to send to Chechnya, sent sleeping bags and shoes to Chechnya on behalf of AWR, and purchased minutes for satellite phones AWR sent to Chechnya. [Id. at 70-77.] Later, AWR learned that the satellite phones had been disconnected. AWR also sent hand-held walkie-talkies to Chechnya. Jayyousi was President of AWR and made the decisions about where the organization sent its aid. [Id. at 83, 111, 120]. Collins stated that at some point he became concerned that AWR might be involved in more than humanitarian aid to the Chechen refugees. [Id. at 88.] Collins began to distance himself from AWR because the organization’s work “seemed to be more fighting than relief work.” [Doc. 1115, p. 81.]
A. FBI Agent John Kavanaugh’s testimony
Over the defendants’ objections, the government presented the lay opinion testimony of FBI Agent John Kavanaugh, who began working on the present case in May 2002. [Doc. 1116, 1117, 1118, 1119, 1123, 1120, 1121, 1140, 1141, 1393.] Agent Kavanaugh reviewed the telephone intercepts, the summaries for the intercepts, financial records, interview summations, faxes, and other documents pertaining to the case. Based on the present investigation and his participation in over 20 terrorist-related cases, he remarked that the people who were involved in terrorism-related cases used code words in their communications. [Doc. 1116, p. 90-91.] In reviewing the intercepted calls in this case, Agent Kavanaugh noticed the use of code words such' as “football” and “soccer” for jihad; “tourism” for jihad; “tourist” for mujahideen; “sneakers” for support; “going on the picnic” for travel to jihad; “married” for. martyrdom; “trade” for jihad; “open up a market” for opening a group in support of jihad; open up a “branch” for starting a jihad support group; “the first area” for Afghanistan; “school over there to teach football” for a place to train in jihad; “students” for Taliban; “iron” for weapon; “joint venture” for a‘ group of mujahideen; “full sponsorship” for income for room and board (at training camp); and “open the door” for opportunity to go to jihad. [Doc. 1116, p. 91, 141, 161; Doc. 1117, p. 21-61, 100, 105; Doc. 1118, p. 20-126.] Agent Kavanaugh stated that he knew the speakers were using code words because on some occasions they said they were, and at other times he could detect the speakers were using code words by the context of the conversations. [Doc. 1116, p. 90-91.] The agent mentioned that the FBI did summarize a few of the satellite calls, but they were not produced in full transcript form. [Doc. 1121, p. 19.] He testified that the satellite phones were' purchased through the AWR organization.
Agent Kavanaugh testified that the defendants were also secretive in their communications. The speakers on the intercepted calls mentioned that they were not to discuss any “relief’ matters over the phone [Id. at 99.]; that they knew the lines were always monitored [Id. at 105.]; and that they did not like to “name names or areas” during phone conversations. [Doc. 1141, p. 131-33.] Jayyousi mentioned in one of the intercepted calls, that “all these calls are recorded.” [Doc. 1141, p. 146.]
Agent Kavanaugh stated that it was not unusual, for these individuals to use nicknames in their intercepted communications. . In one call, Youssef referred to Hassoun by his nickname, Abu Sayyaf. [Doc. 1118, p. 20, 28-29.] In a call be *1082 tween Hassoun and Youssef, Hassoun stated that they were sending the “Spanish Brother” — Padilla—to Kosovo, where Youssef was participating with Kosovar Muslims in a fight with the Serbian government. [Doc. 1118, p. 33-85.] In another call between Hassoun, Youssef, and an unidentified male, they referred to Padilla as “the Puerto Rican” because of his Puerto Rican descent. [Doc. 1118, p. 81.] Defendants also referred to Padilla by other names, such as “Ibrahim” and “Ukasha.” [Doc. 1116, p. 167; Doc. 1117, p. 33; Doc. 1118, p. 35, 37, 81-82; Doc. 1119, p. 33; Doc. 1123, p. 85.]
Agent Kavanaugh testified about Hassoun, Youssef, and Padilla’s plans for Padilla to travel to Kosovo. [Doc. 1118, Gov’t Ex. 107TRJ They discussed Padilla’s visit with the Blind Sheikh. [Doc. 1116, p. 167.] In a call between Hassoun and Youssef, Youssef mentioned his “partner,” Padilla, in their discussions about travel arrangements to Afghanistan. [Doc. 1117, p. 31-33 (Youssef mentions to Hassoun that Ibrahim will be in agreement to join Youssef).] In another call between Hassoun, Padilla, and others, Padilla stated that an individual needed discipline and obedience to participate in a jihad. [Doc. 1117, p. 105; Gov’t Ex. 81TRJ
The agent also mentioned several intercepted calls discussing Padilla’s travel to Egypt. While Youssef was in Egypt, Hassoun discussed with another individual who attended the South Florida mosque that he was getting together some money for Padilla to travel to Egypt. [Doc. 1118, p. 75-76.] Several months later Padilla traveled to Egypt, where he and Hassoun discussed Padilla’s finances. [Id. at 95-125.] In October 1998, Hassoun conversed with Youssef, who was in Egypt, and an unidentified male, and in response to Hassoun’s inquiry about the Puerto Rican, Youssef responded that Padilla was happy; he was next to him in the building. [Id. at 80-81; Gov’t Ex. 110TR.] During this October call, Hassoun and Youssef discussed finances, particularly Padilla’s monthly expenses. [Id. at 83.] During this same call, Hassoun referenced other people traveling from the United States to Egypt because they “have established the groundwork through Ibrahim.” [Id. at 84.]
Furthermore, while Padilla was still in Egypt, he spoke with Hassoun about finances again and asked Hassoun to send him some money. Hassoun told Padilla that he would send him “one grand.” [Id. at 103.] In a later call, Padilla mentioned to Hassoun that he asked a sister (it was unclear from the record exactly who Padilla asked to assist him) to tell his mother to send him an Army jacket, book bag, and sleeping bag so he would be ready when “the door opened.” [Id. at 108-14.] Also during this time, in October 1999, Hassoun and Padilla conversed about the lack of information Padilla was receiving in Egypt- [Id. at 123; Gov’t Ex. 116TR.] Agent Kavanaugh stated that the information to which Padilla referred regarded the occurrence of jihads. [Id. at 126-130.] Hassoun told Padilla to prepare financially so he could be ready to move to “some area close by.” [7d] Later in the conversation, they discussed whether Padilla would travel to Yemen. Padilla told Hassoun that he did not know if the brothers were good or whether he needed a recommendation to connect him with the “good brothers with the right faith.” [Id. at 134.] Agent Kavanaugh opined that he understood the good brothers to be people who shared the same view of Islam as Padilla did. [Id. at 135.]
In a September 2000 call between Hassoun, Youssef, and an unidentified female, Youssef mentioned that he would be over at “[0]sama’s,” and Padilla was expected to be there. [Doc. 1119, p. 33, 44; Gov’t Ex. 403TR (English translation of Arabic *1083 mujahideen data form dated July 24, 2000).] Agent Kavanaugh understood this to be a reference to Osama bin Laden. [Id] In another call, Youssef told Hassoun and another individual that he traveled to Azerbaijan, near Chechnya, and Padilla went to Al Muqbil, Yemen. [Id. at 87-88.] Padilla told Hassoun that he performed the jihad and met some brothers from Yemen. [Doc. 1121, p. 170-172.]
Agent Kavanaugh testified that the defendants referenced other terrorist groups and leaders in their conversations. [Doc. 1116.] Hassoun mentioned Sheikh Abu Azzam, leader of MAK. [Id. at 145.] In one call, Youssef mentioned to Jayyousi that he and Padilla wanted to visit the Blind Sheikh (Islamic Group of Egypt). [Doc. 1116, p. 167.] Hassoun and Youssef discussed Dr. Ayman al-Zawahiri and Abu Fayez (“Mohammad Chehade”), the leader of the Global Relief Foundation. [Doc. 1118, p. 20.]
Agent Kavanaugh also testified about a fax that Hassoun received that contained two documents. [Doc. 1117, p. 78; Gov’t Ex. 212FT.] One of the documents was a letter about an issue in Ogaden, Ethiopia, and the second one was a communique involving Libya. The letter mentioned the killing of 200 infidels, which referenced the number of Ethiopian soldiers who were killed by the Muslim brothers. In a call regarding the fax, Hassoun told Youssef that 56 of the brothers were “married there,” which indicated that they were martyred during the fighting. [Doc. 1117, p. 73; Gov’t Ex. 212FT.] Hassoun also stated that the Ethiopian army moved in with tanks and armored vehicles and the brothers launched a counterattack and drove them away. [Id. at 76.] Hassoun mentioned that there were heavy casualties, and that the “dogs” were helping the Ethiopian Army. [/&] Agent Kavanaugh opined that he understood the reference to the dogs as being a reference to the United States government. [Id. at 77.]
Agent Kavanaugh interpreted a call between Hassoun, Kassem Daher, and another individual, in which Hassoun stated that “they [were] playing football in Somalia” and they needed to send “sneakers” over there. [Doc. 1117, p. 102-03 (stating that Hassoun meant jihad and support for jihad).] In a lengthy call in August 1998, Youssef called Hassoun from Egypt to inform Hassoun that the “joint venture” they had formed resulted in the loss of 70. [Doc. 1118, p. 58.] Hassoun responded that “70 got married completely.” [7d] Youssef then talked about the various groups he encountered in Kosovo and told Hassoun that they thought of joining brothers in another town, but by the time they wanted to join the “club,” it was being shelled heavily by the enemy. [Id. at 64.] Hassoun asked Youssef if they had “balls and clothes and everything, sports equipment?” [Id. at 65.] Agent Kavanaugh opined that these words indicated weaponry. [Id.]
Agent Kavanaugh identified banking records associated with Hassoun. [Doc. 1117, p. 103, Gov’t Ex. 600A-E.] One of the checks, dated 1/31/97, was addressed to Kassem Daher for the amount of $2,000 and the word “Somalia” was written on the reference line. The check was written five days after a phone call in which Hassoun discussed playing football in Somalia. [Id. at 104-05.] Agent Kavanaugh identified a cashier’s check written by Hassoun for $5,000 to Mohammad Hisham Sayefedeen, part of Youssef s full name, that appeared in wiretap intercepts and Youssefs passport. [Id. at 137-38, Gov’t Ex. 413.] The government introduced a deposit slip for $5,000 in the name of Hassoun. [Id. at 140, Gov’t Ex. 600D.] The agent identified a financial document involving a wire transfer from Hassoun to Mohammad His- *1084 ham Youssef. [Id. at 141, Gov’t Ex. 601.] The government presented Hassoun’s credit card statement for June/July 1998, and the agent identified the $5,242 transaction as the amount for the wire transfer reflected in government’s exhibit 413. [Id. at 143-44, Gov’t Ex. 602.] The agent also identified several other checks from Hassoun. [Doc. 1141, p. 36-91.] There were two checks from Hassoun to Global Relief Foundation — each in the amount of $2,500 — with one check containing the words “tourism” and “Chechen information” on the memo line, along with a quote from the Koran.
Defendants elicited from Agent Kavanaugh the fact that Padilla was involved in very few phone calls; that Padilla did not use code words in his conversations [Doc. 1121, p. 58-172.]; and that Hassoun and Jayyousi used similar phrases when they discussed charitable relief work. [Doc. 1119, p. 88; Doc. 1123; Doc. 1120; Doc. 1121, Doc. 1140.] Agent Kavanaugh acknowledged that the government did not intercept any calls between Padilla and Youssef. [Doc. 1121, p. 58-172.] Defendants questioned Agent Kavanaugh about many calls involving the defendants’ relief work to show the jury that they lacked the intent necessary to commit the charged crimes. [Doc. 1140, p. 53.]
B. Dr. Rohan Gunaratna’s testimony
The government also presented historical background information about conflict zones and key figures in the violent Islamic movement through the testimony of Dr. Rohan Gunaratna, the head of the International Center for Political Violence and Terrorism Research in Asia. Dr. Gunaratna testified about the characteristics of the support cells upon which the violent Islamic movement relies. [Doc. 1393, p. 114-184; Doc. 1137; Doc. 1138; Doc. 1139; Doc. 1136, Doc. 1394; Doc. 1157; Doc. 1158.] Dr. Gunaratna had studied the fields of terrorism and political religious violence for about twenty-five years and had been a teaching fellow at the U.S. Military Academy and at the Fletcher School for Law and Diplomacy at the Egyptian Center for Counter Terrorism Studies. He testified that the International Center manages one of the largest terrorism databases in the world, and it creates counter-terrorism research centers in conflict zones such as Kabul, Afghanistan, and Pakistan. He explained that the International Center works with a number of governments and countries around the world to create environments that hinder terrorist support.
Dr. Gunaratna testified that he had a special focus on Islamic organizations from 1993 to 1996, particularly organizations advocating jihad. He authored ten books, one entitled “Inside Al-Qaeda,” and he had been an expert witness in terrorism cases for both the prosecution and the defense. While conducting his research into al-Qaeda, he interviewed members of Islamist radical groups, spoke to academicians, and traveled to countries where radical Islamist violence occurred, such as Pakistan and Iraq. The district court admitted him as an expert in the area of al-Qaeda and its associated groups and in the area of international terrorism. [Doc. 1393, p. 134.]
Dr. Gunaratna provided background information on al-Qaeda and Osama bin Laden, a Saudi who moved to Pakistan and founded al-Qaeda, an organization committed to establishing Islamic states based on Islamic law. Islamic law is historically opposed to the political process and to democratic regimes. [Doc. 1393, p. 135— 39.] Abdullah Azzam helped found the predecessor of al-Qaeda, and he was a key ideologue of the jihadist movement. [let] Abdullah Azzam consistently campaigned for the creation of Sharia-based Islamic states (states governed by strict imposition of Islamic laws), and had no problem with *1085 using force to achieve his political objectives. When he used the word “jihad,” he meant the use of violence. [Id.] Abdullah Azzam and bin Laden created MAK, an organization to recruit and assist fighters coming to Afghanistan. In November 1989, Abdullah Azzam was killed, and bin Laden took control of MAK and created al-Qaeda to work with MAK to support different jihadist groups which were fighting globally. Al-Qaeda had a military training camp on the Afghanistan/Pakistan border. [Id. at p. 144-55.]
Dr. Gunaratna testified that al-Qaeda established and managed the Advice and Reformation Committee to distribute propaganda. This committee had an office in the United Kingdom, and Khalid al-Fawwaz served as the leader. Dr. Gunaratna acknowledged that Jayyousi received a fax from this committee, informing Jayyousi that al-Fawwaz had been appointed as bin Laden’s representative to operate in that region. He acknowledged that this publication, which Jayyousi received via fax, was sent to a specific group of people. [Id. at 158-63.] He stated that al-Qaeda had relationships with other radical Islamist groups outside of Afghanistan, and it provided support for these like-minded groups. [Id. at 169-70.]
Dr. Gunaratna also provided information regarding the support cells that provide assistance to terrorist and militant organizations. He stated that the support cells provide funds, transportation, safe houses, communications, training, and recruitment. He explained that these cells operate through “front” organizations, such as community, religious, humanitarian, and educational charities. [Id. at 173-80.] He also testified that in his research, he learned that members of these support cells and groups use code words and double talk in their communications by substituting key words likely to draw suspicion with more common verbiage. [Id. at 181.]
In reviewing the telephone intercepts in this case, Dr. Gunaratna opined that the defendants used code words in some of their communications. When they used the word “tourism,” that meant armed jihad; the word “football and/or soccer” meant fighting or combat; the phrase “to be married” referred to going to paradise or martyrdom; the phrase “first area” meant Pakistan or Afghanistan; the word “screws” meant bullets; the word “eggplant” meant a rocket propelled grenade launcher; and other words denoting fruits and vegetables were used as codes for arms. [Doc. 1137, p. 11-15.] He noted that many of these words were in other transcripts that he reviewed between radical Islamist groups and their supporters. [Id. at 12.] His interpretation of the code words’ meanings was similar to Agent Kavanaugh’s testimony, except that Dr. Gunaratna opined that when the defendants used the word jihad, they meant the violent or armed jihad, whereas the agent did not specify if the word jihad meant violent or peaceful jihad.
Dr. Gunaratna testified that during a phone call, Hassoun referenced bin Laden by his nickname, “Abu Abdallah,” which was known only by his supporters. [M at 27.] In a later call, Jayyousi mentioned bin Laden’s mentor, Sheikh Salman, and mentioned a CNN interview with bin Laden that showed the radical Islamic violence in Somalia during that time period. Both Hassoun and Jayyousi discussed a statement or “fatwa” (a religious opinion usually issued by established religious leaders but also issued by radical leaders) that threatened America. Dr. Gunaratna opined that this fatwa the defendants discussed was “very likely” the same fatwa issued by bin Laden in August 1996. [Id. at 52-53.] In that same call, Jayyousi mentioned Armed Islamic Group, which was one of the most violent groups and wanted to establish an Islamic state in *1086 Algeria. [Id. at 58.] In commenting on a statement by Hassoun that MAK can deal with “these people” by “the sword,” Dr. Gunaratna testified that “these people” meant the people in the White House, and by “the sword” was a term commonly used by the MAK leader and radical Islamists. [Id. at 72.]
The government presented other calls in which the defendants discussed the Chechen conflict. Dr. Gunaratna explained that the Chechens were Muslims who lived in Russia and were attempting to separate from Russia. [Id. at 94-132.] At some point, the Arab mujahideen assisted the Chechen separatists, and Ibham Omar al Khattab — together with bin Laden and Fat’hi Shishani, leader of the International Islamic Brigade — fought with the Afghans against the Soviets. Shishani’s group was violent and wanted to create Islamic states wherever Muslims lived; this group was an extension of al-Qaeda. [Id. at 104-06.] Dr. Gunaratna testified that the foreign mujahideen fighters in Chechnya engaged in a lot of violence; killings, suicide attacks, and martyrdom were common. [Id. at 108.] He stated that al-Qaeda provided financial support directly to the fighters in the Chechen conflict. [Id. at 117.] Dr. Gunaratna also commented on calls between some of the defendants in which they discussed the success of the Chechen conflict, evidenced by the fact that the Russian flag was no longer flying over the Chechen capital of Grozny. They also discussed the provision of funds to the Chechen separatists. [Id. at 111-22.]
Dr. Gunaratna described the conflict in the Muslim area of Kosovo, Yugoslavia that occurred in the 1990s. [Id. at 143.] Foreign mujahideen assisted in this conflict, later establishing a presence in bordering Albania. Al-Qaeda provided financial and other support to these fighters in Kosovo. The Kosovar people opposed these fighters because the people perceived them as too violent. Dr. Gunaratna commented on a call in which Youssef informed Hassoun that he was in Albania, which was the launching pad for the Arab mujahideen to enter Kosovo. [Id. at 149.]
Dr. Gunaratna testified that al-Qaeda’s most significant number of training camps was in Afghanistan, and their purpose was to train people to participate in violence. [Doc. 1139, p. 7.] “Al-Qaeda’s premier facility for providing training in the 1990’s was the al-Frooq camp” near Kandahar. [Id. at 10.] He commented on the secrecy of the training camps and the necessity of having an individual recommend you for training, especially for American Muslims. He stated that al-Qaeda kept records on the people who attended the training camps, and the attendees had to complete a mujahideen application form. He noted that a number of these forms were discovered from various Arab safe houses and training camps. [Id. at 19-30.] He testified that a new recruit could not provide his real name on the identification form. [Id. at 31.]
The government questioned Dr. Gunaratna regarding other intercepted calls he reviewed. In one call, Hassoun identified himself with the Abu Muhjin group, and he discussed al-Ittihad al-Islami. Dr. Gunaratna stated that both of these groups are radical Islamic groups. [Doc. 1158, p. 145.] He also commented on several calls involving Jayyousi. In one call, Jayyousi referred to funds for preparations and referred to the “first area” — code for Afghanistan. [Id. at 146-47.] In another call, Jayyousi spoke to the Blind Sheikh and referred to Chechnya, saying that the government was an Islamic government, “but it is full of heresy.” Dr. Gunaratna noted that this statement was consistent with the view of establishing an Islamic state in Chechnya. [Id. at 168.] Jayyousi also referred to bin Laden in another call and discussed a fundraiser to collect mon *1087 ey to send to Afghanistan. Jayyousi clarified that the brother of whom he spoke was Arab, not Afghani, which Dr. Gunaratna testified was an important distinction because the terrorist groups wanted to support primarily the Arab mujahideen. [Id. at 177-79.]
On cross-examination, , defendants attacked Dr. Gunaratna’s credibility and his qualifications as an expert. [Doc. 1139, p. 71; Doc. 1136; Doc. 1394; Doc. 1157.] They did elicit from Dr. Gunaratna that he had not listed AWR and Save Bosnia Now as cover organizations for jihad terrorist groups; however, he did list the Islamic Group of Egypt as one. [Doc. 1157, p. 96.] He acknowledged that in the intercepted calls he reviewed involving Jayyousi, he discerned no code talk. [Id. at 113.]
The government presented several other witnesses in its case-in-chief. A Department of Defense employee testified that he performed a personnel search on Padilla and discovered that Padilla did not serve in the military. [Doc. 1159, p. 21.] FBI Agent Russell Fincher testified that he interviewed Padilla at the Chicago O’Hare airport in 2002. [Id. at 90-101.] Fincher stated that Padilla acknowledged some of his travels, but was evasive regarding his overseas travel. Joyce Kandalaft, a contract linguist with the FBI, identified several documents: two checks .from Hassoun to the Canadian Islamic Association, one in the amount of $8,000 for “tourism” and another in the amount of $3,000 for “tourism” and ,“tourists”; a check from Hassoun to AWR in the amount of $5,000 “for the brothers”;, a check from Hassoun to Jayyousi for $600; several checks from Hassoun to Global Relief, one in the amount of $5,000 for “Kosovo,” one in the amount of $600 for “Kosovo support,” one with “Chechen tourism and media” and a Koranic verse on it, and one in the amount of $2,000 for “Afghan Relief.” [Doc. 1160, p. 7, Gov’t Ex. 600H-R.] The government also presented a portion of a CNN videotape of an interview with Osama bin Laden. [Doc. 1137, p. 32.]
C. Defense case
The defendants presented an expert in English/Arabie interpretation and translation to challenge the government’s evidence regarding the defendants’ use of code words. [Doc. 1200.] He testified that many of the alleged code words had other, more innocuous meanings than indicated by the government witnesses. He stated that a mujahid is someone who fights for a cause, either religious or political, or it can mean a person who provides a service for the infirm or for refugees. [Id. at 71, 97.] However, he acknowledged that most of the government’s translations were correct. [Id. at 127-28.]
An Imán, a religious leader in the Muslim community, testified that he met Hassoun at a Florida mosque. [Doc. 1201.] He testified that the mosque was very involved in charity and “alms giving,” and the mosque collected money fór victimized Muslims in other countries. Hassoun asked him for permission to hold fundraisers in the mosque for projects in Bosnia, Kosovo, and Chechnya. The Iman testified that Hassoun did not recruit mujahideen fighters within the mosque. Hassoun presented the testimony of his father-in-law, who testified that he and Hassoun were joking when they spoke of belonging to Abu Muhjin. [Doc. 1203, p. 45-59.] The other defense witnesses were character witnesses, such as co-workers and people who participated in humanitarian relief efforts with some of the defendants. [Doc. 1246, 1204, 1205.]
IV. DISCUSSION
A. Admission of Agent Kavanaugh’s testimony
Defendants challenge the district court’s admission of Agent Kavanaugh’s *1088 testimony under Federal Rule of Evidence 701, specifically arguing that the district court abused its discretion in allowing Agent Kavanaugh to testify regarding his interpretation of the meanings of alleged code words the defendants used in the telephone intercepts. They argue that the agent should not have been allowed to proffer his lay opinion because he was not present during all of the intercepted calls and he did not have a rationally based perception of what the individuals meant when they used the code words. We review the district court’s ruling regarding the admissibility of the agent’s lay testimony under Rule 701 for a clear abuse of discretion. See United States v. Myers, 972 F.2d 1566, 1576-77 (11th Cir.1992).
Rule 701 allows a lay witness to offer opinions or inferences if they are “(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” Fed.R.Evid. 701. Subsection “(a) is the familiar requirement of firsthand knowledge or observation” and the limitation in (b) is phrased in terms of requiring that the lay witness’s testimony be helpful in resolving issues. Id. advisory committee’s note. In the 2000 Amendments, Rule 701 was changed “to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.” Id. advisory committee’s note.[4]
Agent Kavanaugh’s testimony was rationally based on his perception. While investigating this case for five years, Agent Kavanaugh read thousands of wiretap summaries plus hundreds of verbatim transcripts, as well as faxes, publications, and speeches. He listened to the intercepted calls in English and Arabic.
At trial, defendants objected to Agent Kavanaugh’s opinion testimony because he did not personally observe or participate in the defendants’ conversations and based his testimony largely on documents admitted into evidence. We have never held that a lay witness must be a participant or observer of a conversation to provide testimony about the meaning of coded language used in the conversation. We have allowed a lay witness to base his opinion testimony on his examination of documents even when the witness was not involved in the activity about which he testified. We have held that the testimony of a financial analyst of the FBI who “simply reviewed and summarized over seven thousand financial documents,” was properly admitted under Rule 701 in United States v. Hamaker, 455 F.3d 1316, 1331-32 (11th Cir.2006). The financial analyst of the FBI in Hamaker “added and substracted numbers from a long catalogue of ... records, and then compared those numbers in a straightforward fashion.” Id. The testimony was “rationally based on the perception of the witness.” Id. at 1332 (quoting Fed.R.Evid. 701). We have also held that testimony of a lay witness in a prosecution for Medicare fraud was “based on ‘first hand knowledge or observation,’ ” United States v. Gold, 743 F.2d 800, 817 (11th Cir.1984) (quoting Fed. R.Evid. 701 advisory committee note), *1089 when it was “based on [the witness’s] own examination of ... store[ ] records,” id.
Defendants rely on United States v. Cano, 289 F.3d 1354 (11th Cir.2002), to support their argument, but their reliance is misplaced. In Cano, a cocaine trafficking and money laundering case, the government proffered Case Agent Donnelly to testify regarding the “hieroglyphics” or symbols contained in a defendant’s phone book. Id. at 1360-61. ' The government did not proffer the agent as an expert. Id. at 1360. The agent “deciphered] the hieroglyphics — by correlating the ten digit telephone number of members of the conspiracy (obtained from the wiretaps) with the ten hieroglyphic symbols opposite their names in the phone book.” Id. at 1360-61. For the first time on appeal, the defendants objected, based on Rule 701(a), to Agent Donnelly’s testimony regarding his deciphering. We agreed with the defendants that the agent was prohibited from testifying about the meaning of a simple code that the jury could have deciphered easily based on evidence admitted at the trial, id. at 1363-64, but based on the overwhelming evidence of guilt, we concluded that the error did not affect the defendants’ substantial rights. Id. at 1364.
In the present case, Agent Kavanaugh testified about the meanings of code words that he learned through his examination of voluminous documents during a five-year investigation. His testimony was more similar to the lay testimony held admissible in Hamaker and Gold than the testimony held inadmissible in Cano. Just as the testimony of the lay witnesses in Ha-maker and Gold was “rationally based,” Fed.R.Evid. 701(a), on their perception of business records, Agent Kavanaugh’s testimony was also based on a review of documents and “rationally based on [his] perception,” id. By contrast, Agent Donnelly “merely delivered a jury argument from the witness stand” when he drew “inferences ... based on facts already in evidence.” Cano, 289 F.3d at 1363. But Agent Kavanaugh had examined thousands of documents, many of which were not admitted into evidence. Agent Donnelly deciphered only a simple code, but Agent Kavanaugh’s familiarity with the investigation allowed him to perceive the meaning of coded language that the jury could not have readily discerned.
We also reject the defendants’ argument that Agent Kavanaugh’s testimony was not “helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue.” Fed.R.Evid. 701(b). We have held that a lay witness may provide interpretations of code words when the meaning of these words “[is] not ‘perfectly clear’ without [the witness’s] explanations.” United States v. Awan, 966 F.2d 1415, 1430-31 (11th Cir.1992) Agent Kavanaugh’s knowledge of the investigation enabled him to draw inferences about the meanings of code words that the jury could not have readily drawn. His testimony helped the jury understand better' the defendants’ conversations that related to their support of international terrorism because they “would likely be unfamiliar with the complexities” of terrorist activities. Id. at 1430. In his testimony he linked the defendants’ specific calls to checks, wire transfers, and other discrete acts of material support that put the code words into context. [Doc. 1120, p. 21.]
The defendants also contend that the district court erred in allowing Agent Kavanaugh’s testimony under Rule 701(c). We disagree. In Hamaker, the financial analyst of the FBI testified as a lay witness even though “his expertise and the use of computer software may have made him more efficient at reviewing [the] records.” 455 F.3d at 1331-32. We permitted his testimony because he “did not testify ... based on his financial expertise, *1090 nor did he express any expert opinion.” Id. at 1331. See also United States v. Rollins, 544 F.3d 820, 832-33 (7th Cir. 2008) (holding that a law enforcement agent’s testimony was admissible under Rule 701(c), even though the agent had “years of experience as a law enforcement officer,” because “his understanding of the[ ] conversations came only as a result of the particular things he perceived from monitoring intercepted calls” and his testimony was based on his “perceptions derived from [that] particular case”), cert. denied, — U.S.-, 130 S.Ct. 3343, 176 L.Ed.2d 1236 (2010).
The record confirms that Agent Kavanaugh based his testimony about the meaning of the code words on his experience from this particular investigation. He limited his testimony to what he learned during this particular investigation, and he testified that he interpreted code words based on their context [Doc. 1116,p. 90, 93.] The district court explained that “it appears as if this witness’s training and experience to opine on what certain things mean is the investigation of this case.” [Doc. 1116, p. 41.] The district court also limited the agent’s testimony to facts he learned in his investigation of the defendants. [Doc. 1119, p. 118 (“I want to make sure ... this witness’s answer ... is based upon things that he learned in the course of this investigation. That is how he was proffered to the Court as a 701 witness.”).] Therefore, we conclude that the district court did not abuse its discretion in allowing Agent Kavanaugh to testify regarding his interpretation of the defendants’ use of code words in the intercepts because the government satisfied the criteria under Rule 701.
B. Sufficiency of the evidence
Padilla challenges the sufficiency of the evidence on all three counts, and Jayyousi contends that the government did not present sufficient evidence to convict him on Count 3, the substantive 18 U.S.C. § 2339A material support offense based upon an underlying 18 U.S.C. § 956(a)(1) conspiracy. In reviewing challenges to the sufficiency of the evidence, we must accept all reasonable inferences that support the verdict and “affirm the conviction if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt.” United States v. Mieres-Borges, 919 F.2d 652, 656 (11th Cir. 1990) (internal quotation marks omitted). When a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt, “[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt ... A jury is free to choose among the constructions of the evidence.” United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir.1997) (quoting United States v. Hardy, 895 F.2d 1331, 1334 (11th Cir. 1990)).
The record shows that the government presented evidence that the defendants formed a support cell linked to radical Islamists worldwide and conspired to send money, recruits, and equipment overseas to groups that the defendants knew used violence in their efforts to establish Islamic states. Agent Kavanaugh, who was in charge of the bulk of the investigation in this case, identified numerous conversations among the defendants discussing Padilla’s travels to countries where Muslims were victimized. The government presented Padilla’s mujahideen identification form that indicated his intent to attend a jihad training camp. The government’s expert testified to the secrecy of the training camps, and the requirement that a recruit, particularly an American Muslim, receive a recommendation from a reliable brother to attend the camp. He also acknowledged that al-Qaeda kept rec *1091 ords on the recruits who attended the training camps and that the recruits did not provide their real names on the identification forms. Government witness Goba confirmed the expert’s testimony regarding the secrecy of the jihad training camps, the need for someone to recommend each recruit, and the purpose of the camp, which was to train individuals in weapons and war tactics for military jihad.
The record provides sufficient evidence for a reasonable jury to find that Padilla trained with al-Qaeda and shared his conspirators’ intent to support jihad violence overseas to establish Islamic states. The government presented evidence of numerous discussions between the conspirators regarding the various conflicts involving Muslims overseas. The evidence showed that Youssef, Hassoun, and Padilla began discussing attendance at al-Qaeda camps before Padilla left for Egypt in September 1998. [Doc. 1117, p. 28-35, 43-50; Gov’t Ex. 58TR.] In various calls, Youssef stated that he was ready to work with the refugees in Kosovo, and that he fought on the front lines in the Kosovar conflict. [Doc. 1117, p. 149-51; Doc. 1118, p. 35-37; Gov’t Ex. 97TR, 100TR.] Hassoun expressed his desire to send another recruit to Kosovo, and Youssef suggested Padilla. [Doc. 1117, p. 150-51.] Later, Hassoun told Youssef that he would send money with Padilla. [Doe. 1118, p. 35-37.] Further, Padilla was secretive about his plans to attend the training camp, instructing Hassoun not to tell Youssef any plans over the phone. [Doc. 1117, p.117-18; Gov’t Ex. 88TR.]
The record also demonstrates that the conspirators did not intend for Padilla to remain in Egypt, but instead, they planned for him to prepare to leave Egypt for jihad at the first opportunity, [Doc. 1118, p. 105; Gov’t Ex. 113TR/114TR (Padilla telling Hassoun how to reach him in case the “door opens”).], and planned for Padilla to travel to the Chechen jihad after he received his training. While traveling to fight in Chechnya, Youssef told Hassoun that he would soon be with bin Laden and Khattab’s company, and when Hassoun asked about Padilla, Youssef stated that Padilla was traveling to the “area of [0]sa-ma [bin Laden].” [Doc. 1119, p. 44-46, 58-59; Doc. 1158, p. 153-56, Doc. 1393, p. 58-63; Gov’t Ex. 118TR, 119TR.] Another intercept further dispels Padilla’s contention regarding the sufficiency of the evidence. In October 2000, Hassoun asked Youssef if he would join “Abu Abdullah, the Puerto Rican” in Afghanistan, and Youssef responded that he had experience fighting on the front lines and did not need to hone his military skills. [Doc. 1119, p. 79-80; Gov’t Ex. 124TR.] Based on the above, we conclude that there is sufficient record evidence to support Padilla’s convictions on Counts 1 and 2.
Padilla and Jayyousi both challenge the sufficiency of the evidence to convict, them on Count 3. In order to convict Padilla and Jayyousi under the substantive count, the government did not have to prove that Padilla and Jayyousi personally committed violent acts; rather, the government had to prove that these individuals knew that they were supporting mujahideen who engaged in murder, maiming, or kidnapping in order to establish Islamic states. The evidence supports the jury’s reasonable inference that Padilla and Jayyousi knew the training camps trained recruits in weaponry and war tactics and that they shared a common purpose to support violent jihad to regain the lands that were once under Islamic control [See, e.g., Gov’t Ex. 802, The Islam Report where Jayyousi wrote, “May Allah help the mujahideen topple these un-Islamic and illegal puppet regimes in our Muslim lands.”]. The record indicates Padilla provided himself as material support in the form of a recruit for jihad training; per *1092 sonal information on the mujahideen identification form matched Padilla’s personal information on his passport; the government expert identified Padilla’s fingerprints on the form; the government expert testified that the use of code words is a signature trait of a terrorism support cell; Jayyousi received a fax that had bin Laden’s signature on it [Gov’t. Ex. 200.]; Jayyousi oversaw the purchase of satellite phones, walkie talkies and encrypted radios to send to Chechnya to aid the Muslims in their armed conflict; Jayyousi told Mohamed Shishani that the donations for the radios (to assist in communication during fighting) did not come in time to prevent the killing of mujahideen by friendly fire; and Jayyousi acknowledged in a conversation that all their calls were recorded. We conclude that this evidence, along with other evidence presented by the government, was sufficient for a reasonable jury to conclude that Jayyousi and Padilla were guilty of providing material support or resources, knowing that these would be used in preparation for carrying out a conspiracy to murder, kidnap, or maim overseas.
C. Admission of Dr. Gunaratna’s testimony
Defendants argue on appeal that the district court erred in allowing Dr. Gunaratna to testify as an expert witness because his methodology was unreliable. Specifically, they claim that they were unable to verify his methods because he would not identify the interviewees upon whom he based his information due to confidentiality agreements he had signed with them. Furthermore, Dr. Gunaratna had to rely on translators during his communications with the interviewees, and defendants contend that this compromised the reliability of the information he gleaned from his interviews. They also contend that he was not qualified to testify about the use and importance of code words in communications among violent jihad supporters. “We review a trial court’s evidentiary rulings on the admission of expert witness testimony for abuse of discretion.” Toole v. Baxter Healthcare Corp., 235 F.3d 1307,1312 (11th Cir.2000).
Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed.R.Evid. 702. In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-95, 113 S.Ct. 2786, 2796-98, 125 L.Ed.2d 469 (1993), the Supreme Court stated that Rule 702 compels the district courts to perform the critical “gatekeeping” function concerning the admissibility of expert evidence. This function “inherently require[s] the trial court to conduct an exacting analysis” of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir.2002). In determining the admissibility of expert testimony under Rule 702, district courts must consider whether the expert can testify competently on the areas he intends to discuss, whether the expert’s methodology is sufficiently reliable, and whether the expert’s testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998).
*1093 Defendants filed a pre-trial Daubert motion, which the district court denied without holding a hearing. At trial, the district-court accepted Dr. Gunaratna as an expert in the areas of al-Qaeda and its associated groups and international terrorism. During their cross-examination, defendants objected to Dr. Gunaratna’s testimony because he based his opinion on confidential or classified information. [Doc. 1136, p. 42-50.] They also made a Sixth Amendment objection. [Id.] The government responded that the location where Dr. Gunaratna interviewed these individuals was irrelevant, and he would be breaching confidentiality agreements with governments if he revealed where he conducted the interviews and the identity of the people he interviewed. [Id. at 50-54.] The government also responded that Dr. Gunaratna based his identification of the al-Qaeda form from his viewing of similar documents, not from his interviews. [Id.]
The district court noted that the defendants had been able to call into question Dr. Gunaratna’s credibility on cross. [Id. at 49.] Then, the district court sustained the objections on relevance grounds, finding that “the fact that he has maintained confidential relationships with other governments is not relevant to this, case.” [Id. at 54-55.] The defendants made no specific objection to Dr. Gunaratna’s testimony about the use of code words by violent Islamists. Therefore, because the defendants did not preserve this particular challenge to Dr. Gunaratna’s testimony regarding code words, we will address this challenge under the plain error doctrine. See United States v. Arias-Izquierdo, 449 F.3d 1168, 1185 n. 8 (11th Cir.2006) (noting that appellate court will remand on an issue not raised in the district court only if “there is (1) error, (2) that is plain, (3) that affects substantial rights, and ... (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings”). We conclude from the record that the district court did not plainly err in allowing Dr. Gunaratna to testify regarding the use of code words by violent radical groups. Based on his specialized knowledge of Islamist radicals, Dr. Gunaratna was able to testify regarding their method of communication. Further, his testimony related to trial evidence, helped the jury understand the unique use of certain words in the intercepted calls, and countered defendants’ claim that these words did not have violent connotations.
With regard to defendants’ objection to Dr. Gunaratna’s qualification as an expert, we conclude that the district court did not abuse its discretion in accepting him as an expert witness. A review of the record indicates that the defendants had broad latitude in their cross-examination, and the district court acknowledged that they had been able to call into question Dr. Gunaratna’s credibility during cross. Defendants challenged his undisclosed sources for his published works and thoroughly questioned him about his interviews with extremists. [Docs. 1139, 1136, 1394, 1157, 1158.] The district court properly determined that the defendants’ inability to obtain the location of Dr. Gunaratna’s interviews and the identities of the interviewees did not make Dr. Gunaratna’s methodology unreliable. Accordingly, we conclude that the district court’s admission of Dr. Gunaratna’s testimony was not “manifestly erroneous.” United States v. Douglas, 489 F.3d 1117, 1124 (11th, Cir. 2007) (quoting Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1339-40 (11th Cir.2003)).
D. Admissibility of televised interview of Osama bin Laden
Defendants argue that the district court erred by admitting into evidence a *1094 portion of a 1997 CNN interview with Osama bin Laden. Jayyousi and Hassoun objected at trial to the video’s presentation based on Rule 401, arguing relevancy. Padilla objected based on Rule 403, arguing that it was prejudicial to him because there was no evidence he watched the interview or discussed the interview with another co-defendant. The district court admitted a seven-minute portion of the bin Laden interview, stating that the jury could consider the evidence as it pertained to Jayyousi and Hassoun’s states of mind, but not Padilla’s. The government presented evidence of numerous calls, [see Gov’t Ex. 84, 85, 52, 53], in which Jayyousi and Hassoun referred to bin Laden by his nickname “Abu Abdallah,” which was known only to his supporters and identified him as one of the biggest backers of jihad in Afghanistan. The two also discussed the videotaped interview and an August fatwa that Dr. Gunaratna stated was “very likely” issued by bin Laden as a threat to America. [Doc. 1137, p. 23.]
We review the district court’s admission of the edited portion of the videotaped interview for abuse of discretion. See United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir.2000). Federal Rule of Evidence 403 states that relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.” Fed.R.Evid. 403. The district court conducted the proper balancing test and mitigated the prejudice to the defendants by instructing the jury to consider the video not for its truth, but rather as state of mind evidence against Hassoun and Jayyousi. [Doc. 1137, p. 32-34.] The district court clearly expressed to the jury that there was no indication that the defendants were connected to the 9/11 attacks. [M] Further, the district court only admitted a seven-minute portion of the twenty-four minute video, only played it once for the jury, and did not allow the government to ask any witnesses questions regarding the video’s content. Cf. United States v. Chandia, 514 F.3d 365, 375 (4th Cir.2008) (finding that if the district court erred in admitting three-minute video clip glorifying the 9/11 attacks, any error was harmless because clips were not a central part of government’s case, they only lasted three minutes of five-day presentation of government’s case, and clips were only played once to jury). Because “Rule 403 is an extraordinary remedy which should be used only sparingly,” United States v. Merrill, 513 F.3d 1293, 1301 (11th Cir.2008) (internal quotation marks omitted), the excerpted portion of the video did not present a risk of unfair prejudice such that the district court committed an abuse of discretion in allowing the government to present it to the jury.
E. Padilla’s Motion to Suppress
Padilla filed a motion to suppress statements he made during his interview with FBI agents at the Chicago O’Hare International Airport in May 2002. He argued that his statements were inadmissible because the FBI agents failed to administer Miranda[5] warnings prior to interrogating him. The magistrate judge conducted an evidentiary hearing on the motion and issued a report and recommendation denying the motion to suppress. Padilla filed his objections with the district court, and the government filed its response. The district court fully adopted the factual findings of the magistrate judge and denied Padilla’s motion. On review of the district court’s disposition of the motion to suppress, we review the facts under the clearly erroneous standard and the application of the law to the facts *1095 de novo. United States v. Brown, 441 F.3d 1330, 1344 (11th Cir.2006).
In Miranda, the Supreme Court established a set of enumerated warnings that officers are required to give suspects prior to custodial interrogation. See United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir.2004). An interrogation is custodial when “under the totality of the circumstances, a reasonable man in [Padilla’s] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.” Brown, 441 F.3d at 1347 (internal quotation marks omitted). The test is objective, and “the reasonable person from whose perspective ‘custody’ is defined is a reasonable innocent person.” United States v. Moya, 74 F.3d 1117, 1119 (11th Cir.1996). Additionally, because of the sovereign interest in securing entry points to the United States, “some degree of questioning and of delay is necessary and is to be expected at entry points.” Id. at 1120. “Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest.” Id. (internal quotation marks omitted). See also United States v. Lueck, 678 F.2d 895, 899 (11th Cir.1982) (“Interrogation at the border constitutes one notable exception to the constitutional protection of Miranda. Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States.”).
When Padilla arrived at the airport, he passed through customs where agents discovered that he possessed $10,526 in United States currency, although his written declaration stated that he possessed only $8,000. [Doc. 500, p. 4-46.] A customs agent escorted Padilla to a conference room to talk to the FBI agents. Padilla was not in handcuffs or otherwise physically restrained. FBI Agent Fincher stated that he wanted to speak with Padilla to gain his cooperation because the FBI believed that Padilla had information which would prevent a terrorist attack. Agent Fincher testified that he did not restrain Padilla, and Padilla was forthcoming about his background and some of his travels. After a dinner break, which lasted over an hour, Agent Fincher asked Padilla if he would continue discussing his travels and the money he had in his possession, and Padilla indicated his desire to cooperate. Agent Fincher asked Padilla why he declared $8,000 when he was carrying over $10,000, and Padilla stated that he did not know that this was against the law and that the amount of money was not a “big deal.” Agent Fincher expressed skepticism about Padilla’s statement that the amount of money was not a big deal. Padilla then asked to call his mother, but when Agent Fincher asked him why he wanted to call his mother, Padilla “dropped the subject.” [Doc. 549, p. 4.] Padilla did not ask to leave or to speak with an attorney. After Padilla stated that he was tired, the agents thanked Padilla for his cooperation and offered to take him to a hotel and pay for his stay in order to give him an opportunity to rest and continue the interview the following day, but Padilla declined because he wanted to “clear this up that day.” [Doc. 549, p. 4-5.] Padilla again stated that he wanted to contact his mother, and Agent Finch-er testified that the agents did not tell Padilla that he could not contact his mother. [Doe. 549, p. 5.] But Padilla did not make the phone call, and the interview continued. [Id] They continued discussing Padilla’s overseas travel, and when Agent Fincher asked about his passport, Padilla stated that it had been stolen in a *1096 market, but he could not remember the name of the market or the date it was stolen.
Following another break, Agent Fincher confronted Padilla with what the agent believed were Padilla’s intentions during his travels. He stated that he believed Padilla had been in Afghanistan, training with and meeting al-Qaeda officials, that these officials sent Padilla back to Pakistan, where he later departed for another location to commit an act of terrorism, that Padilla had been delayed and detailed in Karachi, and that Padilla then traveled from Zurich to Egypt and eventually to Chicago, where he intended to commit or conduct surveillance for a terrorist act. Agent Fincher asked for Padilla’s assistance to understand what was going on, but Padilla stood up and announced that the interview was over and it was time for him to go. Agent Fincher told Padilla that if he did not assist the government, he would be served with a grand jury subpoena to compel his testimony in New York. About an hour later, Padilla declined to assist Agent Fincher, and the agent arrested Padilla and read him his Miranda rights.
We agree with the district court that the earlier portions of the interview were not custodial in nature, but we do not agree with the district court’s conclusion that the entire interview was non-custodial in nature. Similar to Moya, where we held that a defendant was not in custody, Padilla “was [not] handcuffed ... physically held or moved, or ... accompanied by uniformed officers. Nor was he subjected to booking procedures, [or] told he was not free to leave.” Moya, 74 F.3d at 1119. “Nothing indicates that [Padilla] ever asked to leave or to see a lawyer” before Agent Fincher’s accusation that Padilla was linked to terrorist activities. See id. Even Agent Fincher’s offer to take Padilla to a hotel for the night to allow him to rest establishes that a reasonable person under the circumstances would not have believed that he was subject to a degree of restraint comparable to arrest because he was given the opportunity to leave the interview.
After the second break, however, when Agent Fincher accused Padilla of terrorist activities, a reasonable person would have felt subjected to a degree of restraint comparable to arrest. At this point, the interrogation became custodial, and it is evident by Padilla’s reaction to Agent Fincher’s accusation — he stood up and announced that the interview was over. Because the interview became custodial in nature, any statements Padilla made after he was accused of participating in terrorist activities and before he received his Miranda warning would have been inadmissible. A review of the record reveals that Agent Fincher did not testify at trial about any statements Padilla made after he accused Padilla of participating in terrorism-related activities. [Doc. 1159, p. 90-129.] Thus, no error occurred at trial, and Padilla is not entitled to relief on this claim.
The dissent contends that the questioning became accusatorial when Agent Fincher confronted Padilla about not telling the truth about the source and purpose of the money that he had failed to declare, but being accused of lying about the funds did not make the interview custodial. We have held that a suspect questioned for approximately four hours at an entry point after he had tried to retrieve a shipment of 62 kilograms of cocaine was not in custody for purposes of Miranda until he was formally arrested. United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir.2001). Law enforcement agents knew about the cocaine and questioned McDowell extensively about his activities at the point of entry, and the agents accused McDowell of *1097 lying. Id. at 1359. But “[t]he substance of the questioning was not accusatory,” and “the teachings of Moya suggested] that McDowell was not ‘in custody.’ ” Id. at 1363.
The dissent relies on several decisions, most of which do not involve interrogation at a border crossing, and its reliance on factors that support a finding of custodial interrogation in non-border cases is of limited value. We have “stressed] that events which might be enough often to signal ‘custody’ away from the border will not be enough to establish ‘custody’ in the context of entry into the country.” Moya, 74 F.3d at 1120. The only precedential decision relied on by the dissent that involves a border crossing is United States v. McCain, 556 F.2d 253 (5th Cir. 1977), where our predecessor court explained that being forced to abandon one’s luggage was “itself ... a sufficient restriction on one’s freedom of action so as to trigger the giving of Miranda warnings before proceeding with any interrogation.” Id. at 255. The dissent argues that Padilla was in custody because he did not have possession of his money or luggage, but Padilla’s money would have been subject to forfeiture whether or not Padilla left the interview as a part of customs enforcement, [Doc. 549, p. 2 n.l] and the district court made no finding that the government had seized Padilla’s luggage. The dissent also argues that Padilla was in custody for purposes of Miranda because, in a context that did not involve customs enforcement we explained that, “[a]n officer’s asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave.” United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 (11th Cir.1986). But the dissent ignores that “ ‘referral of a person entering this country to a secondary inspector is part of the ‘routine’ border interrogation and does not, in and of itself, focus on the person so as to require a Miranda warning.’ ” Moya, 74 F.3d at 1120 (quoting United States v. Henry, 604 F.2d 908, 920 (5th Cir.1979)).
F. Padilla’s motion to dismiss his indictment
The district court denied Padilla’s motion to dismiss his indictment based on alleged outrageous government conduct while he was in custody at the Naval Consolidated Brig in South Carolina due to his designation as an enemy combatant. “[A] motion to dismiss the indictment due to outrageous government conduct involves a question of law that we review de novo.” United States v. Avery, 205 Fed.Appx. 819, 824 (11th Cir.2006). We have never applied the outrageous government conduct defense and have discussed it only in dicta. See United States v. Ciszkowski, 492 F.3d 1264, 1272 (11th Cir.2007) (Carnes, J„ concurring) (describing the outrageous government conduct doctrine as rooted in “speculative dicta” and noting that we have never “reversed a conviction or vacated a sentence on th[is] basis”). Several of our sister circuits have either rejected this defense completely, see United States v. Boyd, 55 F.3d 239, 241 (7th Cir.1995), or have been sharply critical of the defense, see e.g., United States v. Tucker, 28 F.3d 1420, 1422-27 (6th Cir.1994) (citing separa tion of powers concerns and discussing the lack of authority for any argument that outrageous government conduct violates due process); United States v. Santana, 6 F.3d 1, 3 (1st Cir.1993) (“Outrageous misconduct is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts.”).
Although we have never acknowledged the existence of the outrageous government conduct doctrine, we note that the actionable government misconduct must relate to the defendant’s underlying or charged criminal acts. “Outra *1098 geous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant’s predisposition by employing methods that fail to comport with due process guarantees.” Ciszkowski, 492 F.3d at 1270 (majority opinion) (citing United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir.1998)).
Padilla does not allege any government intrusion into his underlying criminal conduct. Padilla does not claim that the government caused him to leave the United States to be a jihad recruit. Instead, his claim of outrageous government conduct relates to alleged mistreatment he received at the brig after the conclusion of his criminal acts and prior to the. indictment on the present charges. Thus, even if we were to adopt it, the doctrine does not apply in this situation, and the district court properly concluded that Padilla was not. entitled to the relief he sought in his motion for dismissal of his indictment. See United States v. Mom-son, 449 U.S. 361, 365-66, 101 S.Ct. 665, 668-69, 66 L.Ed.2d 564 (1981) (stating that “absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate” and that the remedy in such situations “is limited to denying the prosecution the fruits of its transgression”).
G. Exclusion of Uways’s statement and Padilla’s statement
Hassoun contends that the district court excluded evidence that was material to his defense in violation of his constitutional rights. There are two specific pieces of evidence about which Hassoun complains. One involves a classified statement by Abdallah Ahmad al-Rimi, a.k.a. “Uways,” demonstrating that an al-Qaeda facilitator, Malik, and not Hassoun, recruited Padilla to go to Afghanistan. The government required, and the district court conducted, an ex parte in camera review under § 4 of the Classified Information Procedures Act, 18 U.S.C. app. 3 §§ 1-16 (“CIPA”). After reviewing all the pertinent materials, the district court approved an unclassified summary of Uways’s statement, which was produced as discovery before trial. [Doc. 914.] The summary stated:
During the 2003-2004 timeframe, Uways noted that fellow facilitator Abu Mal[ik] Al-Sharabi had met Abu Abdallah AIAmriki during the Hajj and had convinced him to come with him to Yemen in 2000, so that he could then travel to join the second jihad in Afghanistan. During this time, Uways met with Abu Abdallah on numerous occasions to get to know him, ask him why he was willing to join jihad, and vet his personality in order to determine whether he would be a satisfactory candidate to send to jihad. Uways claimed that he ultimately decided not to send Abu Abdallah to jihad. As a result, Abu Malik turned to Rashad Sa’id Al-Abi, aka Al Fida, to get Abu Abdallah to Afghanistan. Eventually, Uways saw Abu Abdallah again in Qandahar and Zormat, Afghanistan, in late 2001. Uways identified a picture of U.S. citizen Jose Padilla as being Abu Abdallah Al-Amriki.
[Id. at 2.] Hassoun sought admission of the unclassified summary, and the district court denied the motion, finding that Uways’s statement was hearsay and not admissible under Federal Rule of Evidence 807 because Hassoun did not present the court with indicia of trustworthiness pertaining to Uways’s hearsay statement. [Doc. 1052, p. 2.] Hassoun also moved to compel production of Uways, but the government responded that he was not in the custody of the U.S. government. The district court denied the motion. [Id.]
*1099 The other specific piece of evidence that Hassoun claims was improperly excluded involves statements Padilla made to officials in a classified videotaped interview taken during Padilla’s detention at the brig. During his detention, Padilla explained to the authorities that Malik had introduced him to al-Fida. After briefing and evidentiary hearings, the court concluded that Padilla’s statements were not admissible under Rule 807 because they were untrustworthy due to the conditions of Padilla’s detention. [Doc. 1053.] Hassoun also filed a motion to sever his trial from Padilla’s based on Uways’s statements, Padilla’s admissions, and pervasive pretrial publicity generated by the government regarding Padilla’s alleged activities. The district court denied this motion. [Doc. 992.]
We review the district court’s evidentiary rulings and its denial of a motion for severance for an abuse of discretion. United States v. Westry, 524 F.3d 1198, 1214 (11th Cir.2008) (evidentiary motions); United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir.2004) (denial of a motion for severance). An abuse of discretion occurs where “the district court’s decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.” Westry, 524 F.3d at 1214 (internal quotation marks omitted). We see no abuse of discretion in the district court rulings.
The district court properly excluded Uways’s statement under Rule 807, which provides in part:
A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
Fed.R.Evid. 807. The residual hearsay exception applies only when “certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.” United Techs. Corp. v. Mazer, 556 F.3d 1260, 1279 (11th Cir.2009) (internal quotation marks omitted). Congress intended the residual hearsay exception to be used only in exceptional circumstances. Id.
Exceptional circumstances are not present in this case. The district court reviewed the classified material and provided a summary of Uways’s testimony for the parties to consider. The district court found that Uways’s statement did not contain “equivalent circumstantial guarantees of trustworthiness” as required by Rule 807. Additionally, Uways’s statement was not “more probative on the point for which [Hassoun] offered than any other evidence” that Hassoun could have procured. Id. As a matter of fact, Hassoun made arguments at closing that he did not recruit Padilla for the training camp. [Doc. 1208, p. 139-145.] Moreover, the government introduced Padilla’s identification form which states that the person who recommended Padilla for camp entry was al-Fida. [Gov’t Ex. 403.] Accordingly, we conclude that the district court did not abuse its discretion in excluding Uways’s statement.
The district court also properly excluded Padilla’s statements because it found that the statements were not trustworthy in part because the military interrogators themselves stated that Padilla was often untruthful. [Doc. 1053, p. 7-8.] Because the district court was in the best position to access the reliability of the evidence, we *1100 cannot say that its exclusion of the evidence was an abuse of discretion.
We also cannot say that the district court’s denial of Hassoun’s motion for severance was an abuse of discretion because there was no error in the district court’s exclusion of the challenged evidence. Furthermore, we see no merit to Hassoun’s argument that the district court should have granted his motion for severance due to the pre-trial publicity surrounding Padilla. The district court presided over a four-week jury selection and gave instructions to the jury about the pretrial publicity. [Doc. 1269, p. 7-10; Doc. 1247; Doc. 992.] Hassoun cannot show that the joint trial “prevented] the jury from making a reliable judgment about guilt or innocence” such that the district court should have granted a severance. Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Accordingly, we conclude that Hassoun is not entitled to a reversal of his convictions on this ground.
H. Application of the terrorism enhancement
Hassoun and Jayyousi object to the district court’s application of the terrorism sentencing enhancement, U.S. Sentencing Guidelines Manual § 3A1.4 (2001). Defendants rely primarily on their assertion that their benign motive in assisting the oppressed Muslims was not calculated to influence or affect the conduct of any government. They also claim that the evidence was insufficient for the district court to find that their activities were intended to displace infidel governments that opposed radical Islamist goals. The 12-level enhancement applies if the “offense is a felony that involved, or was intended to promote, a federal crime of terrorism.” Id. § 3A1.4(a). The Guidelines, § 3A1.4 cmt. n.l, define a federal crime of terrorism by referring to 18 U.S.C. § 2332b(g)(5), which states that it is any offense that violates a specified federal statute and is “calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.” 18 U.S.C. § 2332b(g)(5). We review the district court’s interpretation and application of the Guidelines de novo and its underlying factual findings for clear error. United States v. Foley, 508 F.3d 627, 632 (11th Cir.2007).
The district court found that the crimes charged are among the specified statutes that could give rise to a “federal crime of terrorism.” [Doc. 1372, p. 6-7.] The district court noted that the version of 18 U.S.C. § 2332b(g) in effect in 2001 specifically identified 18 U.S.C. § 2339A as an offense supporting the terrorism enhancement. [Id.] The district court also found that the defendants’ activities were calculated to influence, affect, or retaliate against government conduct, satisfying the other element of the enhancement. [Id. at 7-10.] Specifically, the district court reasoned:
Defendants Hassoun and Jayyousi argue that any conduct that resulted in criminal liability in this case was based upon their motives to help Muslims under physical attack or to provide each other aid to -Muslims in distress. The government [contends that motive is unimportant in this analysis. The counts of conviction specify the nature and level of the defendants’ intent and that is all the Court needs to examine in making the determination under the statute, according to government counsel....
The language of the indictment available to the jury contained the following language: It was the purpose and object of the conspiracy to advance violent jihad, including supporting and participat *1101 ing in armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping and maiming for the purpose of opposing existing governments,----
Given the indictment, there is within the jury verdict a finding that the defendants’ actions were intended to bring about the downfall of governments that were not Islamic or not Islamic enough.
There was also ample evidence introduced at trial that defendants Jayyousi and Hassoun wished to impose Sharia throughout the Middle East and remove governments in the process.... Hassoun railed against secular governments in the Middle East and pledged allegiance to individuals and organizations who sought to eliminate the secular governments or non-Islamic governments in the Middle East.
... However, in finding the defendants guilty, the jury rejected the defendants’ premise that they were only providing nonviolent aid to Muslim communities. Even so-called benign motive is subject to the enhancement if the defendants, as here, intended by their acts to affect or retaliate against the conduct of the government.
[Id. at 7-9.]
The district court did not err in applying the terrorism sentencing enhancement. As the district court found, the crimes charged against the defendants are among the specified statutes that can give rise to a federal crime of terrorism. Thus, the first element is satisfied. The district court also found that the Guidelines’s precise language focuses on the intended outcome of the defendants’ unlawful acts — i.e., what the activity was calculated to accomplish, not what the defendants’ claimed motivation behind it was. See United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir.2004) (“[I]t is the defendant’s purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered.”); United States v. Awan, 607 F.3d 306, 316-17 (2d Cir.2010) (finding that government only had to demonstrate that defendant’s offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them). The record demonstrates that the defendants’ support activities were intended to displace “infidel” governments that opposed radical Islamist goals. Jayyousi and Hassoun spoke expressly about their desire to impose Sharia, toppling existing governments in the process. [Gov’t Ex. 802 (Jayyousi’s statement in The Islam Report: “May Allah help the mujahideen topple these un-Islamic and illegal puppet regimes in our Muslim lands.”); Gov’t Ex. 70 (Hassoun’s statement that Muslims have a duty of jihad to regain every land that was under the umbrella of Islam).] Defendants’ motive “is simply not relevant.” Awan, 607 F.3d at 317. Thus, the second element is satisfied, and the district court properly applied the terrorism sentencing enhancement.
I. Padilla’s sentence (cross-appeal)
The government contends that the district court erred proeedurally and substantively in imposing a sentence below the Guidelines range for Padilla. The district court calculated Padilla’s advisory range, applying the 2001 Guidelines, and placed him at offense level 40 and criminal history category VI, corresponding to a 360 months-to-life sentence. The district court also imposed the terrorism sentencing enhancement. After hearing arguments on the 18 U.S.C. § 3553(a) factors, the district court lowered Padilla’s offense level to 33, which produced a guideline range of 235-293 months’ imprisonment, then selected 250 months as the possible term of imprisonment. The district court then varied *1102 downward an additional 42,months to reflect Padilla’s prior detention and imposed a 208 months sentence.
The government argues that the district court committed numerous sentencing errors: first, it improperly relied on the fact that Padilla’s actions did not involve an act of terrorism directed to-the United States; second, it improperly relied on the fact that the defendants did not personally kill, maim, or kidnap anyone; third, it erred by finding that a variance was necessary to avoid unwarranted sentencing disparity; fourth, it erred by finding that Padilla did not complete his al-Qaeda training; and fifth, the district court did not provide sufficient detailed explanation for why it deviated from the Guidelines range. The government also asserts that the district court committed a substantive error in imposing Padilla’s sentence because it did not fully acknowledge Padilla’s extensive criminal history. The government stated that Padilla was a career offender based on over 17 arrests, his, participation in a murder while he was a juvenile, his offense for battery on law enforcement, and his weapons possession offense. [PSI para. 160-82.] Because the district court did not sufficiently consider Padilla’s criminal record, the government posits that it substantively erred in imposing his sentence.
We review the district court’s sentencing decision for reasonableness, imposing a deferential abuse of discretion standard of review. Gall v. United States, 552 U.S. 38, 41, 128 S.Ct. 586, 591, 169 L.Ed.2d 445 (2007). The Supreme Court created a two-step process for review to ensure that district courts do not commit either procedural or substantive errors in imposing sentences. The appellate courts “must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range.” Id. at 51, 128 S.Ct. at 597. The first step, aimed at addressing procedural errors, highlights the continued importance of the Guidelines, and the Supreme Court’s intention that the “continued use of the Guidelines in an advisory fashion would further the' purposes of Congress in creating the sentencing system to be honest, fair, and rational.” United States v. Talley, 431 F.3d 784, 787 (11th Cir.2005). The second step concerns the substantive reasonableness of the sentence. “When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.” Gall, 552 U.S. at 51, 128 S.Ct. at 597. If the sentence imposed is outside the Guidelines range,’ the appellate court must determine that the district court’s consideration of the 3553(a) factors justified the variance. Id.
The district court did not commit procedural error. Neither party contends that the district court failed to properly calculate the Guidelines range or treated the Guidelines as mandatory. The district court considered the 3553(a) factors, and we do not require “the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553 factors.” United States v. Scott, 426 F.3d 1324, 1329 (11th Cir.2005). Although a district court errs when it relies on clearly erroneous findings of fact and the government argues that the district court erroneously found that Padilla did not complete his al-Qaeda training, the record does not support a conclusion that this finding was clearly erroneous. Padilla’s Arabic alias was list *1103 ed only on the second translation of the alQaeda training graduation list. [Doc. 1371, p. 19.] The original translation listed a similar name that was referenced several times in the blue binder. [Id. at 19-20.] Furthermore, the district court adequately explained that it gave Padilla a sentence that was below the Guidelines range for several reasons: the conditions of Padilla’s prior confinement, his allegedly low risk of recidivism due to his age at the time of his anticipated release, the comparable sentences imposed on other terrorists, and the fact that Padilla did not personally injure anyone or target Americans in his conspiracy.
However, Padilla’s sentence is substantively unreasonable because it does not adequately reflect his criminal history, does not adequately account for his risk of recidivism, was based partly on an impermissible comparison to sentences imposed in other terrorism cases, and was based in part on inappropriate factors. First, the district court acknowledged that Padilla had a criminal history but then unreasonably discounted this criminal history when it imposed a sentence. The presentence investigation report classified Padilla as a career offender, pursuant to U.S.S.G. § 4B1.1, because of his extensive criminal history, which included 17 arrests and a murder conviction. Congress has expressed a desire that career offenders receive sentences “of imprisonment at or near the maximum term authorized,” 28 U.S.C. § 994(h), and Padilla’s Guidelines sentence reflected this policy, but the district court deviated from this policy. The Guidelines are not mandatory and a district court is often free to give a below-Guidelines sentence, but the discretion of a district court to sentence a criminal is not unbounded. Padilla’s sentence of 12 years below the low end of the Guidelines range reflects a clear error of judgment about the sentencing of this career offender. Hassoun had no prior criminal history but received a sentence that is only 20 months less than Padilla’s sentence.
Second, Padilla’s sentence unreasonably fails “to protect the public from further crimes of the defendant.” 18 U.S.C. § 3553(a)(2)(C). The district court explained that given Padilla’s age when he is eligible to leave the criminal system, he will unlikely engage in new criminal conduct. [Doc. 1373, p. 14.] The government argues to the contrary that “the risk of recidivism upon release is very real. That risk is greater because Padilla has literally learned to kill like a terrorist.” [Gov’t Br., p. 75.] We agree that the district court failed to consider the nature of Padilla’s crimes and his terrorism training. Although recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. See United States v. Irey, 612 F.3d 1160, 1213-14 (11th Cir.2010) (en banc), cert. denied, — U.S. -, 131 S.Ct. 1813, 179 L.Ed.2d 772 (2011). We also reject this reasoning here. “[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.” United States v. Meskini, 319 F.3d 88, 92 (2d Cir.2003). Padilla poses a heightened risk of future dangerousness due to his al-Qaeda training. He is far more sophisticated than an individual convicted of an ordinary street crime.
Third, in considering “the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,” 18 U.S.C. § 3553(a)(6), the district court unreasonably failed to consider the significant distinctions between Padilla’s circumstances and the sentences of other offenders the district court referenced at the sentencing hearing. [Doc. *1104 1373, p. 15-16.] In comparing Padilla to criminals like David Hicks, Yahya Goba, and Imran Mandhai who had either been convicted of less serious offenses, lacked extensive criminal histories, or had pleaded guilty, the district court erred. See United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir.2009). The district court also improperly relied on the Terry Nichols and Zacarías Moussaoui prosecutions as examples of the types of behavior that warrant a life sentence because the government sought the death penalty in those cases. On remand, we admonish the district court to avoid imposition of a sentence inconsistent with those of similarly situated defendants. It should not draw comparisons to cases involving defendants who were convicted of less serious offenses, pleaded guilty, or who lacked extensive criminal histories, nor should it draw comparisons to cases where the government sought the imposition of the death penalty. See United States v. Abu Ali, 528 F.3d 210, 265 (4th Cir.2008) (“[T]o require a similar infliction of harm before imposing a similar sentence would effectively raise the bar too high. We should not require that a defendant do what ... Nichols did in order to receive a life sentence.”).
Next, the district court substantively erred in reducing Padilla’s sentence based on the fact that Padilla did not personally harm anyone and his crimes did not target the United States. The jury convicted Padilla of violating a statute that prohibits any conspiracy to murder, kidnap, or maim outside the United States. We held in a pre-Booker case that a district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime. Mandhai, 375 F.3d at 1249. ■ Post-Booker, the Fourth Circuit held that “[t]o deviate [a sentence downward] on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct.” Abu Ali, 528 F.3d at 264. Furthermore, the Guidelines account for the distinction between a murder offense and a conspiracy to murder offense. See U.S.S.G. § 2A1.5.
Lastly, we have held that a district court may reduce a sentence to account for the harsh conditions of pretrial confinement, United States v. Pressley, 345 F.3d 1205 (11th Cir.2003), but that decision does not justify a downward departure as extensive as the one the district court gave Padilla. In Pressley, we held that a district court had discretion to lower a 30 year sentence by two and one-half years when the defendant had been confined for six years prior to trial, five of which were spent in a 23 hour a day “lockdown.” Id. at 1219. Here, the district court reduced Padilla’s sentence by 110 months largely based on the harsh conditions of his prior confinement and then lowered his sentence by another 42 months to account for the time Padilla spent in pre-trial confinement, for a total of 152 months’ departure. Although some downward variance is allowed in this circumstance, the district court abused its discretion when it varied Padilla’s minimum Guidelines sentence downward by 42 percent, a period more than three and one-half times his period of actual pretrial confinement.[6] Accordingly, the district court substantively erred in imposing Pa *1105 dilla’s sentence, and we vacate and remand his sentence to the district court for re-sentencing.
The dissent argues that by vacating Padilla’s sentence we have usurped the authority of the trial judge, but “[Booking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones.” Irey, 612 F.3d at 1160. The dissent emphasizes that the district court considered all the factors it was required to consider, but the district court “commit[ted] a clear error of judgment in considering the proper factors.” Id. at 1189. The district court attached little weight to Padilla’s extensive criminal history, gave no weight to his future dangerousness, compared him to criminals who were not similarly situated, and gave unreasonable weight to the conditions of his pre-trial confinement.
V. CONCLUSION
We have meticulously reviewed the entire record of the four-month trial in this case and conclude that the defendants are not entitled to relief on any of their claims. We do conclude, however, that the district court erred in imposing Padilla’s sentence. Accordingly, we affirm the defendants’ convictions in all respects but vacate Padilla’s sentence and remand his case to the district court for re-sentencing consistent with this opinion.
AFFIRMED in part; VACATED and REMANDED in part.

. The authorities have not arrested Mohammed Youssef and Kassem Daher, and they remain fugitives.

. Specifically, 18 U.S.C. § 956(a)(1) provides: Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

. Based on our review of the record, we conclude that the district court did not preclude Hassoun from presenting evidence to support his defense of innocent intent. Hassoun presented evidence of Muslim oppression and the genuine relief efforts he undertook to assist oppressed Muslims. [Doc. 1201, p. 31-131; Doc. 1246, p. 143-176.]

. Rule 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testily thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.” Fed.R.Evid. 702.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Although the government does not challenge the district court's decision to reduce Padilla's sentence by 42 months to reflect his time of pretrial confinement, we note that the Attorney General must already give Padilla credit for his time served in pretrial confinement. 18 U.S.C. § 3585(b); United States v. Witson, 503 U.S. 329, 334, 112 S.Ct. 1351, 1354, 117 L.Ed.2d 593 (1992). On remand, we remind the district court that we "have determined that custody or official detention time is not credited toward a sentence until the convict is imprisoned.” Dawson v. Scott, 50 F.3d 884, 888 (11th Cir.1995).